NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| CENTURY 21 REAL ESTATE, LLC, | : : : : : : : : : : | **Civil Action No. 23-09850-AME**  **OPINION** |
| Plaintiff, |
| v. |
| QUALITY HOMES NETWORK, LLC, et al., |
| Defendants. |

**ESPINOSA, U.S.M.J.**

This matter is before the Court on the parties' competing summary judgment motions. Plaintiff Century 21 Real Estate, LLC ("Plaintiff") seeks summary judgment on its claim for reformation of a negotiated addendum to the parties' long-standing franchise agreement, alleging a mutual mistake resulted in an erroneous increase in an incentive bonus contained in that addendum, for which neither party negotiated. Defendant Quality Homes Network LLC ("Defendant") opposes the motion and cross-moves for summary judgment arguing there was no mutual mistake and the addendum, as written, was a valid offer, which it accepted. Defendant also seeks summary judgment on its breach of contract counterclaim, arguing Plaintiff breached the addendum by first paying but later disavowing the increased incentive bonus. Defendant also seeks attorneys' fees under the franchise agreement. The Court has reviewed the parties' written submissions and decides the motions without oral argument. *See* Fed. R. Civ. P. 78(b). Neither party has met its burden to demonstrate the absence of a material factual dispute permitting it to prevail without trial. *See* Fed. R. Civ. P. 56. Consequently, for the following reasons, both motions are denied.

I.  **BACKGROUND**

On or around June 20, 2008, Plaintiff entered into a franchise agreement with Defendant (the "Franchise Agreement") under which Defendant agreed to pay Plaintiff a franchise royalty fee and contribute to a brand marketing fund ("BMF"). [D.E. 42-1 at 2, ¶¶ 1-2]. In exchange, Plaintiff permitted Defendant to operate certain real estate brokerage offices in Tennessee as "Century 21." [D.E. 39-4; D.E. 42-1 at 2, ¶ 1]. The franchise royalty fee was equal to 6% of the gross revenues from Defendant's brokerage offices. [D.E. 42 at 3; D.E. 39-4 at 13, § 7.1.1]. The Franchise Agreement additionally specifies that, if certain conditions are met, Plaintiff will provide Defendant an annual cash award, called the "Century 21 Incentive Bonus" ("CIB"). [D.E. 39-4 at 13, § 7.2.1]. The CIB is calculated based on the number of Defendant's offices and its gross revenue, pursuant to a table in the Franchise Agreement. [D.E. 42-1 at 2, ¶ 3; D.E. 39-4 at 13-14, § 7.2.1]. At the end of that table, the Franchise Agreement provides, "[i]n no event shall the aggregate annual CIB payable to you as calculated in accordance with the CIB Table exceed 2% of your Annual Gross Revenue." [D.E. 39-4 at 14, § 7.2.1].

At the end of 2022, Defendant's owner and Chief Executive Officer, Jamie Skeen ("Skeen"), reached out to Plaintiff's President and Chief Executive Officer, Mike Miedler ("Miedler"), about the Franchise Agreement. The parties disagree about the purpose of Skeen's and Miedler's conversation. According to Plaintiff, Skeen reached out "and asked for help because he felt his franchise was struggling in the marketplace." [*See* Affidavit of Gregory Sexton, D.E. 39-3 at 2, ¶ 6]. Defendant asserts that Skeen reached out to "discuss his concerns with [Defendant's CIB], which Skeen believed stifled [Defendant's] ability to attract new, producing brokers and made [Defendant] an overall less competitive business." [*See* Defendant's

2

Responsive Statement of Material Facts, D.E. 42-1 at 3-4, ¶ 7]. In any event, Miedler communicated Skeen's concerns to Plaintiff's Chief Operating Officer, Gregory Sexton ("Sexton"), who reached out to Skeen. [*See* Affidavit of Gregory Sexton, D.E. 39-3 at 2, ¶¶ 6-7].

An October 27, 2022 internal e-mail from Sexton to Miedler reflects that, in response to Skeen's inquiry, Sexton suggested, among other things, to "[o]n all options, take his BMF to .5% . . ."; "if Financials bear out real distress, consider a low 3% rate for the next 6 months and give him a prom note for the difference between 3% and what we figure out what would be an appropriate flat rate"; and "if he is on CIB, propose a quarterly CIB for 2023 to help with cash flow."[1] [*See* D.E. 39-6 at 2-3]. The e-mail exchange also reflects that Miedler requested Sexton "communicate with [Skeen] on next steps." [D.E. 39-6 at 2]. A November 4, 2022 internal e-mail provides that "[f]inance agreed to a quarterly CIB," and to "the .5% BMF rate." [D.E. 39-6 at 2; Defendant's Responsive Statement of Material Facts, D.E. 42-1 at 7-8, ¶19]. This was memorialized in Plaintiff's finance committee notes. [*See* D.E. 39-11 at 7].[2]

Subsequently, on or around March 9, 2023, Sexton texted Skeen: "I have the team processing an addendum that will move your BMF to a flat .5%. Also, moving you to a quarterly CIB payment instead of your current one time a year payment. Just wanted you to know what we are sending to you." [*See* D.E. 39-7; Defendant's Responsive Statement of Material Facts, D.E.

---

[1] The "3% rate" mentioned here appears to refer to the franchise royalty fee Defendant was required to pay Plaintiff under the Franchise Agreement, which at the time of this email was 6% of Defendant's gross revenues from its brokerage offices. [*See* D.E. 42 at 3; D.E. 39-4 at 13, § 7.1.1].

[2] The documents Plaintiff cites as its "finance committee notes," Exhibits G and H, do not self-evidently demonstrate that the finance committee's approval was to "move 'to a quarterly CIB, preferably starting in Q1 2023' and 'the .5% BMF rate,'" as Plaintiff contends. [*Compare* D.E. 39-2 at 11 and Affidavit of Gregory Sexton, D.E. 39-3 at 4, ¶¶ 12-13, *with* D.E. Nos. 39-10 and 39-11]. Nevertheless, neither party appears to dispute that the finance committee notes reflect these two approvals. [*See* D.E. 42-1 at 7-8, ¶¶ 19-20]. The Court will not disturb an assertion on which both parties agree.

42-1 at 5, ¶12]. These terms were reflected in Plaintiff's internal "Deal Write-Up" form. [*See* D.E. 39-12]. However, the employee tasked with drafting the Franchise Addendum ("Addendum") copied and pasted a clause from a sample provided to her without realizing the sample specified a CIB rate of 4%. [*See* Affidavit of Gregory Sexton, D.E. 39-3 at 5, ¶ 17]. Consequently, in addition to modifying the BMF payment to a flat .5% and increasing the frequency of Defendant's CIB payments to quarterly, the Addendum also provided that Plaintiff "will issue a [CIB] rebate to [Defendant] in an amount equal to 4% of Gross Revenue ("New CIB Rebate")." [*See* D.E. 39-14]. In his deposition, Sexton testified about the internal process a contract undergoes before it is sent to be executed. [*See* Sexton Deposition, D.E. 40-4 at 9, 27:12-21]. Specifically, Plaintiff's legal department reviews the document, and it is additionally circulated internally before it is sent externally to be signed by the other party. [*Id.*]. After receiving the Addendum, Defendant asserts it took time to review it before signing and executing it on March 27, 2023. [*See* D.E. 39-14; D.E. 40 at 9].

Plaintiff paid Defendant $142,421.16 on or around April 23, 2023, pursuant to the 4% CIB rate specified in the Addendum and based on Defendant's gross revenue for the prior quarter. [*See* Declaration of Jamie Skeen, D.E. 40-11 at 3, ¶ 7-8]. However, in or around June 2023, after discovering that the CIB rate in the Addendum was 4%, Sexton contacted Skeen to communicate that the CIB rate should have been 2%.[3] [Defendant's Responsive Statement of Material Facts, D.E. 42-1 at 13, ¶ 35]. Sexton offered to allow Defendant to keep the initial

---

[3] Plaintiff alleges that, over the 10-year life of the parties' Franchise Agreement, the doubled CIB rate would result in a "windfall" to Defendant of "over $400,000 per year and $4,000,000" in total, on top of the benefit of the decreased BMF and the modified CIB payment timing. [D.E. 39-1 at 9, ¶ 38].

4

alleged overpayment in exchange for Skeen signing a revised addendum."[4] [D.E. 39-1 at 9; *see also* D.E. 39-3 at 5-6, ¶ 21; D.E. 39-16 at 88:1-89:22]. Skeen declined to modify the Addendum to "rectify" the CIB rate. [*See* Affidavit of Gregory Sexton, D.E. 39-3 at 5-6, ¶ 21]. Plaintiff deducted from Defendant's next CIB payment in July to account for what Plaintiff asserted was its 2% overpayment in April. [Declaration of Jamie Skeen, D.E. 40-11 at 3, ¶ 9]. Thereafter, Plaintiff provided quarterly CIB payments to Defendant that reflected a 2% CIB rate. [Declaration of Jamie Skeen, D.E. 40-11 at 4, ¶ 10]. As a result, Defendant asserts Plaintiff breached the terms of the Addendum and owes Defendant approximately $680,339.37 in CIB payment. [*See* Declaration of Jamie Skeen, D.E. 40-11 at 4, ¶ 11].

The parties do not dispute that Skeen and Sexton agreed to (i) change Defendant's contribution to the brand marketing fund "to a flat .5% payment;" and to (ii) change the frequency of Defendant's CIB payment from annually to quarterly. [*See* Defendant's Responsive Statement of Material Facts, D.E. 42-1 at 4-5, ¶ 11]. The parties likewise do not dispute that, prior to the Addendum, neither Skeen nor Sexton discussed increasing the CIB. [*See* Defendant's Responsive Statement of Material Facts, D.E. 42-1 at 6, ¶ 13]. Defendant does not dispute that neither the finance committee notes nor the "Deal Write-Up" form, which was sent to Plaintiff's franchise administration department to prepare the formal addendum, mention any change to the CIB. [*See* Defendant's Responsive Statement of Material Facts, D.E. 42-1 at 8, ¶¶ 20-21;

---

[4] Sexton testified: "I let him know that an overpayment had been made on that first quarterly CIB payment. And that due to the mistake, the company was going to allow him to retain the first payment, but he would have to sign a new addendum making sure that we corrected the error. And then he could keep that amount, but we would be adjusting it back to what he and I had negotiated, and he was aware was negotiated. I also let him know that if he did not want – or decided not to do that, that we would be pursuing full payment back of the amount that was incorrectly disbursed to him." [D.E. 39-1 at 9, ¶ 36].

Affidavit of Gregory Sexton, D.E. 39-3 at 4, ¶¶ 13-14].

## II. DISCUSSION

### A. Legal Standard

Federal Rule of Civil Procedure 56 sets the governing standard applicable to the parties' summary judgment motions, and provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (construing similar language in the predecessor to the current standard). It is well-established that a factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant and is material if, under the substantive law, the dispute would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). On a motion for summary judgment, a party can support its position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

Satisfying the Rule 56(a) standard depends on whether the party moving for summary judgment on a claim bears the burden of proof. The Supreme Court has held that "with respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. In contrast, when the burden of proof falls on the moving party, "that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the essential elements of

its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991)).

Once the moving party has satisfied its initial burden, Rule 56 places the onus on the nonmoving party to establish the existence of a genuine issue as to a material fact. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). In other words, to defeat the motion for summary judgment, the nonmoving party must come forward with sufficient evidence to allow a jury to find in its favor at trial. *Anderson*, 477 U.S. at 248; *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001), *overruled on other grounds by Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Emp'rs*, 134 S. Ct. 773 (2014). The nonmovant "may not rest upon the mere allegations, speculations, unsupported assertions or denials of its pleadings." *Super 8 Worldwide, Inc. v. Anu, Inc.*, No. 13-4852, 2015 WL 1969138, at *2 (D.N.J. Apr. 29, 2015) (citing *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir.2001)); *see also Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990) (holding that "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment"). The Court, however, must view the evidence "in the light most favorable to the opposing party.'" *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). Moreover, in evaluating a motion for summary judgment, the Court may not make credibility determinations or engage in any weighing of the evidence. *Anderson*, 477 U.S. at 255; *see also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (holding same).

**B.     Analysis**

In New Jersey, an enforceable contract requires offer and acceptance, consideration, a meeting of the minds, and sufficiently definite terms. *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435 (1992). A meeting of the minds, or assent, requires that a party have fair notice of a contract's essential terms. *Noble v. Samsung Elec. Am.*, 682 F. App'x 113, 116 (3d Cir. 2017) (applying New Jersey contract law). When determining whether there has been assent to a contract's terms, it is a party's objective, outward manifestation of intent to be bound thereby that controls, not any secret intention the party may have. *Castle Couture, LLC v. Azaria Bridal, LLC*, No. 17-6857, 2020 WL 5587449, at *2 (D.N.J. Sept. 18, 2020) (citing *Brawer v. Brawer*, 329 N.J. Super. 273, 283 (App. Div. 2000)).

The New Jersey Supreme Court has explained that "[a]s a general rule, courts should enforce contracts as the parties intended," and that "it is a basic rule of contractual interpretation that a court must discern and implement the common intention of the parties." *Pacifico v. Pacifico*, 190 N.J. 258, 266 (2007). It is well settled in New Jersey jurisprudence that, "[t]o effectuate the contracting parties' intent, a court may 'reform the terms of a written instrument on a claim of mutual mistake, without regard to whether the writing is in fact ambiguous.'" *Illinois Nat. Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 85 F. Supp. 3d 785, 794 (D.N.J. 2015) (quoting *Cent. State Bank v. Hudik-Ross Co., Inc.*, 164 N.J. Super. 317, 323 (App. Div. 1978)). Indeed, "[t]he power of a court of equity to reform deeds and other writings for the correction of mistakes stands among its most ancient and useful powers." *Cummins v. Bulgin*, 37 N.J. Eq. 476, 477 (Ch. 1883).

"Mutual mistake exists when the parties have 'met and reached a prior existing agreement, which the written document fails to express.'" *Wyndham,* 85 F. Supp. 3d at 794 (quoting *Bonnco Petrol, Inc. v. Epstein*, 115 N.J. 599 (1989)). New Jersey courts have explained that the mistake must be mutual, meaning "reformation is warranted only when '*both* parties were laboring under the *same* apprehension as to [a] particular, essential fact' and when the mistake has a material effect on the agreed-upon exchange." *Wyndham,* 85 F. Supp. 3d at 794 (citing *Beachcomber Coins, Inc. v. Boskett*, 166 N.J. Super. 442 (App. Div. 1979); Restatement (Second) of Contracts § 152(1) (1981)) (emphasis in original). "For a court to grant reformation there must be clear and convincing proof that the contract in its reformed, and not original, form is the one that the contracting parties understood and meant it to be." *Hudik-Ross Co.*, 164 N.J. Super. at 323 (internal quotations omitted). Further, courts in this District have explained that "[e]xtrinsic evidence is admissible to show mutual mistake," because "[i]t would be difficult to determine whether the contract as written fails to express the parties' intent if analysis were confined to the four corners of the contract itself." *Wyndham*, 85 F. Supp. at 795.

### i. Plaintiff's motion for summary judgment on its reformation claim

Plaintiff has not met its burden of demonstrating the absence of a genuine issue of material fact that would entitle it to reformation on summary judgment. Plaintiff argues it is entitled to summary judgment and reformation of the Addendum because there is no genuine dispute of material fact that the CIB rate of 2%—not 4%—is the rate the parties intended to include. Specifically, to support its assertion that it has provided clear and convincing proof that the 4% CIB rate was a mutual mistake that fails to express the parties' understanding as to their agreement, Plaintiff points to (i) the text messages between Skeen and Sexton; (ii) its internal

9

emails and communications; (iii) its Deal Write-Up Form; and (iv) the testimony of both Skeen and Sexton, which all reflect no discussion between the parties regarding the CIB rate. [*See* D.E. 39-2 at 20]. Plaintiff asserts Defendant "has utterly failed to offer any proof that the parties intended and agreed to increase the CIB percentage." [D.E. 39-2 at 22]. Yet, these assertions ignore the arguments and evidence Defendant offers for its position that no mutual mistake occurred.

Specifically, Defendant argues it reviewed the Addendum before signing it and therefore understood the CIB rate would be 4%. [*See* D.E. 42 at 8-9]. In support, Defendant relies, in part, on Skeen's deposition testimony, where Skeen indicated knowledge and intent to enter into an agreement that modified the CIB to 4%. After being asked, "when you received the written addendum from [Plaintiff,] were you surprised that document indicated the CIB amount would be 4 percent," Skeen replied, "I was happy that they were willing to work with me." [*See* Skeen Dep., D.E. 40-5 at 11, 73:3-8]. That testimony asserts, from Skeen's perspective, that the outcome of the negotiations Defendant initiated between the parties culminated in the revised CIB offered by Plaintiff in the Addendum. In other words, Defendant has adduced material evidence—the sworn testimony of its principal—that he reached out to Plaintiff to "discuss his concerns with [Defendant's CIB], which Skeen believed stifled [Defendant's] ability to attract new, producing brokers and made [Defendant] an overall less competitive business," and Plaintiff responded with an offer to revise the CIB. [*See* Defendant's Responsive Statement of Material Facts, D.E. 42-1 at 3-4, ¶ 7; *see also* D.E. 40-5 at 79:15-25.].

Acknowledging that in New Jersey, "reformation is warranted only when '*both* parties were laboring under the *same* apprehension as to [a] particular, essential fact," *Wyndham,* 85 F.

10

Supp. 3d at 794, the Court cannot disregard Defendant's account and must view all the evidence, including Skeen's testimony, in the light most favorable to Defendant, the party opposing summary judgment on this issue. *Tolan*, 572 U.S. at 657. Leaving aside any credibility determinations, the Court concludes that, as the non-moving party, Defendant has presented sufficient evidence for a reasonable fact finder to potentially find in its favor at trial, creating a genuine issue of material fact over the mutuality of any mistake, and meeting its burden to rebut the proofs on which Plaintiff relies. *Anderson*, 477 U.S. at 248.

To be sure, the likelihood that a reasonable fact finder *will* conclude that Plaintiff offered Defendant a revised CIB in the Addendum, as Defendant may have initially sought, despite not having actively negotiated the issue, is subject to fair disagreement. Nevertheless, while Plaintiff insists otherwise, the Court concludes that it has not met its burden to demonstrate the absence of a genuine issue of material fact that, by clear and convincing evidence, *both* parties were laboring under the *same* apprehension as to an essential fact of the contract.[5] Thus, Plaintiff's motion must be denied.

---

[5] Plaintiff relies heavily on the March 9, 2023 text message from Sexton and Skeen—"I have the team processing an addendum that will move your BMF to a flat .5%. Also, moving you to a quarterly CIB payment instead of your current one time a year payment. Just wanted you to know what we are sending to you." [*See* D.E. 39-7; Defendant's Responsive Statement of Material Facts, D.E. 42-1 at 5, ¶12]. Yet, while Skeen replied, "Thank you," [*id.*], that exchange—even when considered with the other evidence Plaintiff offers—does not, as Plaintiff contends, establish the absence of a genuine issue of material fact that those were the only material terms upon which the parties agreed and that the Addendum failed to express. Indeed, Sexton's deposition testimony confirms no prior discussion about the Addendum's waiver-of-claims provision. [*See* Sexton Deposition, D.E. 40-4 at 37:7-38:14; D.E. 39-14 at 3]. And, while the parties dispute the materiality of that non-negotiated provision, Plaintiff does not dispute its validity. [D.E. 42-1 at 6-7]. Rather, Plaintiff asserts it would have required consideration greater than a waiver provision in exchange for increasing the CIB to 4%. [*See* D.E. 39-2 at 16; Affidavit of Gregory Sexton, D.E. 39-3 at 6, ¶¶ 19, 22]. Without weighing the evidence or assessing credibility, the Court finds the waiver provision and other evidence offered by Defendant creates a material fact dispute and rebuts Plaintiff's contention that its evidence establishes the entire agreement between the parties, foreclosing Defendant's argument that the changed CIB was valid despite not being negotiated.

Plaintiff cites *Pilgrim Plaza, LLC v. Xiu Fang Liu*, No. A-5465-14T3, 2017 WL 1326503 (N.J. Super. Ct. App. Div. Apr. 11, 2017), for the proposition that New Jersey courts have granted reformation of contract "under similar circumstances."[6] [D.E. 39-2 at 20-21]. In *Pilgrim Plaza*, however, the trial court held a bench trial on the question of mutual mistake and found that a scrivener's error merited reformation after hearing testimony and considering the parties' "extensive post-trial proposed findings of fact and conclusions or law." 2017 WL 1326503, at *4. The New Jersey Appellate Division affirmed the decision, explaining "the outcome turned largely on the judge's assessment of the credibility of the witnesses, which [the Appellate Division was] in no position to second-guess." *Id.* at *6. Contrary to Plaintiff's arguments that *Pilgrim Plaza* supports granting summary judgment in its favor, the opposite is true. *Pilgrim Plaza* supports denial of Plaintiff's motion, in light of the contradictory evidence concerning the question of mutuality, and the impropriety, at this juncture, of making credibility determinations or engaging in the weighing of evidence. *Anderson*, 477 U.S. at 255.

Plaintiff also relies on *Cherry Hill Retail Partners, LLC v. Marino's Bistro To Go Cherry Hill, LLC*, No. 4639-18, 2021 WL 978889, at *6 (N.J. Super. Ct. App. Div. Mar. 16, 2021), to support its assertion that the circumstances here present "exactly the type of case where courts have granted reformation based on mutual mistake." [D.E. 43 at 12]. The plaintiff in *Cherry Hill* sought reformation of a guaranty that accompanied a lease agreement and presented a certification that explained how the scrivener's error occurred. 2021 WL 978889, at *3-4. The opposing party presented no evidence to challenge the certification. *Id.* Accordingly, the trial

---

[6] *Pilgrim Plaza* involved a lease agreement that mistakenly recorded a tenant's share of real estate taxes as 2.23%, despite the parties previously agreeing in negotiations that the share would be 5.18%. 2017 WL 1326503, at *1-2.

court granted summary judgment and reformed the guaranty because of the "lack of any evidence . . . of any other agreement that would have been guaranteed," and the "lack of any other possible explanation for why" the guaranty would not have been for the intended lessee. *Id.* at \*4. The trial court further explained that either the mistake was mutual, or "somebody altered [the agreement] purposefully," making it a unilateral mistake accompanied by unconscionable conduct or fraud, which would also merit reformation. *Id.* The New Jersey Appellate Division affirmed the reformation, emphasizing the lack of "any contradictory facts or testimony" and "no evidence to refute [the] proofs on mutual mistake." *Id.* at \*7. Although the parties here appear to not dispute that a drafting mistake likely occurred on Plaintiff's part, this matter is distinguishable from *Cherry Hill* because Defendant has presented contradictory evidence and testimony that supports its arguments that the mistake was not mutual, and there is no evidence of fraud or unconscionable conduct.

As another example of "exactly the type of case where courts have granted reformation based on mutual mistake," Plaintiff cites *St. Pius X House of Retreats, Salvatorian Fathers v. Diocese of Camden*, 88 N.J. 571 (1982). [D.E. 43 at 12]. There, a plaintiff sought reformation because it did not intend to include a certain parcel of land, which it had already previously sold, in a conveyance. However, this case does not support Plaintiff's position, but, rather, contradicts it. First, the *St. Pius* trial court denied reformation. *Id.* at 574. Next, in affirming the trial court's decision in *St. Pius*, the New Jersey Supreme Court outlined how all the papers utilized in drafting the agreement included the parcel in question and explained plaintiff "made a mistake by incorporating Lot 2H into the transaction, but that mistake was not shared by [defendant]." *Id.* at 577. Here, by contrast, viewing the facts in the light most favorable to Defendant, there exists

13

a genuine issue of material fact about whether the mistake was shared by both parties: (1) Defendant allegedly sought relief from the financial strain of the parties' Franchise Agreement; (2) the parties discussed and negotiated over some but not all the potential terms appearing in the final Addendum altering that Franchise Agreement; (3) Plaintiff provided deposition testimony about the scrutiny applied to the Addendum before it was delivered to Defendant with the revised CIB provision; (4) Defendant asserts it examined the Addendum upon delivery and accepted it, allegedly "happy" with Plaintiff's choice to "work with" it and revise the CIB. If there was a mutual mistake, Plaintiff has failed to demonstrate the absence of a genuine dispute of material fact about its existence. Accordingly, the Court must deny summary judgment.

### ii. Defendant's summary judgment cross-motion on Plaintiff's reformation claim

Defendant's cross-motion must also be denied. Unlike the relatively lighter burden of opposing Plaintiff's summary judgment motion, Defendant's obligation on its own motion for relief under Rule 56 is not satisfied merely by pointing to the existence of disputed material facts. Indeed, Defendant argues, and must show, that it is entitled to summary judgment on the reformation claim because there is no genuine issue of fact that Plaintiff has not presented clear and convincing evidence of mutual mistake. [D.E. 40 at 15-16].

In support of its argument, Defendant relies on *St. Pius X House of Retreats, Salvatorian Fathers v. Diocese of Camden*, 88 N.J. 571 (1982), and *D.R. by M.R. v. E. Brunswick Bd. of Education*, 838 F. Supp. 184 (D.N.J. 1993), contending that "terms which were not expressly discussed and agreed upon by the parties before the contract was reduced to writing cannot be a 'mutual mistake,' nor the 'basis for reformation.'" [D.E. 44 at 8]. However, Defendant misreads both cases, and neither stand for that blanket proposition.

14

As already discussed above, the seller in *St. Pius* intended to "sell all its properties," and the appraisal and survey of its land mistakenly included a lot that had previously been conveyed to someone else. 88 N.J. at 578-79. The New Jersey Supreme Court denied reformation after finding the factual record—which included appraisals by both the seller and the buyer, and upon which the ultimate deal was structured—identified the property as including the disputed parcel, reflecting "the intention of both parties was the same, that is, that Lot 2H was to be included in the sale." *Id.* at 577-78. While it is true that the *St. Pius* parties appeared to have not explicitly discussed that specific parcel during negotiations, the Supreme Court did not expressly hold that no mutual mistake could have occurred *because* the parcel in question was "not expressly discussed and agreed upon by the parties before the contract was reduced to writing," nor can it be fairly interpreted as standing for that blanket assertion.

Defendant fares no better in relying on *D.R.*, which presented circumstances different from those at issue here. *D.R.* involved a settlement agreement between a school board and a significantly handicapped student who was placed in an out-of-state residential school. 838 F. Supp. at 187. The agreement provided, in relevant part, that the board would contribute a certain percentage of the cost of the student's residential placement. *Id.* The board later declined to cover the cost of a one-to-one aide for the student. *Id.* In response, the student argued the agreement was voidable because "the services of a one-to-one aide were not contemplated at the time the Agreement was executed," and this was "tantamount to mutual mistake." *Id.* at 191. The court found no mutual mistake, after explaining that the plain language and details of the agreement indicated the covered services were "education and basic related services, related residential services, room and board," including "physical therapy, occupational therapy, and

15

speech"—"nothing more and nothing less." *Id.* at 191-92. The court reasoned "there [was] no support for the conclusion that both parties were laboring under a common misconception." *Id.* at 191-92.

In both *St. Pius* and *D.R.,* there was no mutual mistake because, in *St. Pius*, there was sufficient evidence to demonstrate the parties understood what property was to be included in the sale, and, in *D.R.*, there was clear evidence the parties understood what "covered" services entailed. That is different from the circumstances here, where, as discussed above, the parties' proffered evidence creates a genuine issue of material fact about what they understood the agreement in the Addendum to include and whether any mistake was mutual. To rebut Defendant's motion for summary judgment, Plaintiff has provided text messages; internal emails; emails and affidavits reflecting communications with its franchise administration department and that pertain to how the alleged scrivener's error occurred; and testimony, all of which go to its position that the 4% CIB rate included in the addendum was the result of mutual mistake. In other words, Plaintiff here has provided sufficient evidence under the standard to demonstrate that a reasonable fact finder could conclude the parties may have been laboring under a common misconception. Thus, Defendant has not met its burden to demonstrate an absence of evidence to support the nonmoving party's—Plaintiff's—case for reformation. *See Celotex*, 477 U.S. at 325 (explaining "with respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.").

Finally, Defendant cites *Parrette v. Citizens' Cas. Co.*, 128 N.J. Eq. 802 (1940), *Mullen v. Cronan*, 90 N.J. Eq. 392 (Ch. 1919), and *Millhurst Milling & Drying Co. v. Automobile Ins. Co.*, 31 N.J. Super. 424 (App. Div. 1954), in support of its argument that the mistake was not mutual but rather unilateral, and that reformation is therefore inappropriate, because this remedy "cannot be granted . . . in the absence of an allegation of fraud." [D.E. 40 at 15]. Defendant argues "[t]he Court need not look beyond this very simple issue." [D.E. 44 at 3]. But the evidence offered by Plaintiff creates a dispute of material fact that precludes foreclosing the possibility of mutual mistake. Thus, the Court cannot conclude that inclusion of a 4% CIB rate was a unilateral mistake, and Defendant's summary judgment on reformation must be denied.

### iii. Defendant's summary judgment motion on its breach of contract counterclaim

As set forth above, there exists a genuine issue of material fact regarding mutual mistake with respect to the CIB rate in the Addendum, which precludes summary judgment either in favor of or against contract reformation. Thus, the Court must necessarily also deny Defendant's summary judgment motion on its breach of contract counterclaim, because Defendant cannot demonstrate the absence of a material factual dispute as to that claim. "Under New Jersey law, establishment of a breach of contract requires a party to show: '(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations.'" *SAT Agiyar, LLC v. 7-Eleven, Inc.*, No. 19-19994, 2024 WL 3585646, at *5 (D.N.J. July 30, 2024), *corrected*, No. 19-19994, 2024 WL 5107363 (D.N.J. Dec. 13, 2024) (quoting *Frederico v. Home Depot*, 507 F. 3d 188, 203 (3d Cir. 2007)).

Here, Defendant bears the burden of proof on its breach of contract claim, and it must affirmatively establish that on the facts of record, a reasonable juror would necessarily find each element of the claim satisfied. Yet, the Court's denial of summary judgment on the parties' cross-motions addressing mutual mistake leaves open the question of whether the Addendum's current 4% CIB rate is a valid term, or whether the Addendum should be reformed to reflect a different rate. Thus, there exists a genuine issue of fact as to whether the contract Defendant claims Plaintiff breached existed in the first instance. If there was mutual mistake and the CIB term should be reformed to 2%, then there is no contract like that which Defendant asserts resulted from the Addendum, no breach, and no damages. Therefore, Defendant's motion for summary judgment on its breach of contract claim must be denied.

### iv. Defendant's request for attorneys' fees and costs

Finally, Defendant asserts it is entitled to attorneys' fees and costs "incurred in responding to this action, asserting its counterclaim, and bringing the present Motion pursuant to Section 22.11 of the Franchise Agreement." [D.E. 40 at 17-18]. That Section provides:

> We shall be entitled to collect, in addition to any award of damages or injunctive relief, our costs in enforcing our rights under this Agreement against you, including reasonable attorneys' fees, court costs, expert fees, costs of investigation, and other litigation expenses. We shall also be entitled to collect our attorneys' fees, court costs, expert fees, costs of investigation, and other litigation expenses in the event we are the prevailing party with respect to any claim or counterclaim or other legal proceeding brought by you against us in connection with this Agreement and our relationship.

[*See* D.E. 39-4 at 32, § 22.11]. As Plaintiff points out, the Franchise Agreement clearly defines "we" as "Century 21 Real Estate LLC," and defines "you" as "Quality Homes Network LLC." [*See* Franchise Agreement, D.E. 39-4 at 2, §§ 1.1, 1.2; *see also* D.E. 41 at 41]. Therefore, the

18

plain language of this provision of the Franchise Agreement does not contemplate or entitle Defendant to collect attorneys' fees, either for enforcing its rights under the Franchise Agreement or for litigation expenses in the event it is a prevailing party. *See Nevets C.M., Inc. v. Nissho Iwai Am. Corp.*, 726 F. Supp. 525, 533 (D.N.J. 1989) (citing *Independent Oil Workers at Paulsboro, N.J. v. Mobil Oil Corp*., 441 F. 2d 651, 653 (3d Cir. 1971)) (explaining that "[t]he words used in a contract must be given their 'plain and ordinary meaning.'"). Defendant's request for attorneys' fees under Section 22.11 of the Franchise Agreement must be denied.

### III. CONCLUSION

Plaintiff's motion and Defendant's cross-motion for summary judgment will both be denied for failure to satisfy the standard under Rule 56(a). Additionally, Defendant's motion for summary judgment on its breach of contract claim and its request for attorneys' fees and costs must be denied. A separate Order will be filed together with this Opinion.

     /s/ *André M. Espinosa*  
    ANDRÉ M. ESPINOSA  
    United States Magistrate Judge

Dated:  July 25, 2025